**In re Kenneth E. TUREAUD, a/k/a Kenneth E. Tureaud d/b/a Saket Petroleum Co., a/k/a Kenneth E. Tureaud d/b/a Kesat a/k/a Saket Petroleum Company, Debtor.**

Bankruptcy No. 82–01269.

United States Bankruptcy Court,
N.D. Oklahoma.

Jan. 10, 1985.

Gary McDonald and Leonard I. Pataki of Doerner, Stuart, Saunders, Daniel & Anderson, Tulsa, Okl., for trustee.

Craig Blackstock, Tulsa, Okl., for Walter E. Heller.

Reuben Davis and John A. Burkhardt of Boone, Smith, Davis & Hurst, Tulsa, Okl., for Commerce Bank.

Timothy T. Trump, for firm of Hall, Estill, Hardwick, Gable, Collingsworth & Nelson.

## ORDER SUBSTANTIVELY CONSOLIDATING ESTATES

MICKEY D. WILSON, Bankruptcy Judge.

This matter is presently before the Court upon the application of the trustee, R. Dobie Langenkamp, (Trustee) for substantive consolidation of certain affiliate corporations (Affiliates) within this pending Chapter 11 case. The Affiliates as to which consolidation is sought are:

Saket Development Corporation, an Oklahoma corporation, (Saket Development),

Linda Vista Corporation, a Florida corporation, (Linda Vista),

Saket Development Corporation, a New Mexico corporation, now Deer Park, Inc., (Deer Park),

Saket Realty, Inc., an Arizona corporation, (Saket Realty),

Southern Lakes Development Corporation, an Oklahoma corporation, (Southern Lakes),

River Ridge Development Corporation, a Florida corporation, (River Ridge), and

ASAP Corporation, a Michigan corporation, (ASAP).

None of the Affiliates is a debtor in a pending proceeding in any bankruptcy court. The Affiliates filed a combined response wherein said entities adopted and consented to the application.

The application came on for hearing on the 30th day of November, 1984, and the 3rd day of December, 1984. The Trustee appeared in person and by his counsel, Gary M. McDonald and Leonard I. Pataki, of Doerner, Stuart, Saunders, Daniel & Anderson; objector, Walter E. Heller and Company Southeast, Inc. (Heller), appeared through its counsel, Craig Blackstock; Commerce Bank, an Oklahoma corporation, appeared through its counsel, Reuben Davis and John A. Burkhardt; and objector, Hall, Estill, Hardwick, Gable, Collingsworth and Nelson (Hall, Estill), appeared by Timothy T. Trump. The Trustee orally withdrew his application to consolidate as to ASAP Corporation, the ownership of ASAP and its assets having been previously resolved.

The Trustee announced he would stipulate that the effective date of consolidation for purposes of avoidance powers would be June 7, 1983, the date the application was filed. Bank of Commerce and Hall, Estill withdrew their objections to the application, subject to the terms of the stipulation. Heller did not enter into said stipulation but offered to stipulate and withdraw its objection if the effective date of consolidation for purposes of avoidance powers would be November 30, 1984. This offer to stipulate by Heller was not accepted by the Trustee.

The Court finds that notice of the hearing on the application was given to every known creditor of the Affiliates and that such notice was proper and sufficient. No objections were filed by any unsecured creditor of Tureaud or the Affiliates, other than Hall, Estill.

## FINDINGS OF FACT

Upon consideration of the documentary and testimonial evidence properly presented, after hearing arguments of counsel, and being fully advised, the Court makes the following findings of fact.

It is abundantly clear from the evidence that all of the corporate Affiliates were, in fact, the alter ego of the debtor, Kenneth E. Tureaud. The debtor, one individual, dominated and controlled the Affiliates. The business affairs and financial transactions of and among the Affiliates were controlled solely by Tureaud. The debtor directed the transfer of funds and assets by and among the Affiliates with a total disregard for the separate nature of the Affiliate entities.

Each of the six Affiliates were created by Tureaud for his and his family's benefit. Tureaud used the assets of the Affiliates as his own, and he operated the Affiliates as one economic unit with unity of ownership and management. The stock of each Affiliate is either wholly owned by, or substantially owned by Tureaud. In his December 31, 1981, financial statement, (exhibit 1A), Tureaud lists himself as the "Chief Executive and Controlling Owner" of the Affiliates.

It is clear that Tureaud organized the Affiliates merely as a front to raise money for his purposes, and to hinder and delay judgment creditors. Tureaud transferred property to the Affiliates and among the Affiliates for the sole purpose of placing property beyond the reach of creditors. Tureaud has numerous unsatisfied, personal judgments against him dating back to 1974. From 1979 to 1982, Tureaud transacted business through at least nineteen different corporations. The Trustee testified that the only real property held in Tureaud's name consisted of some mineral interests and realty owned in connection with the operations of Saket Petroleum, a sole proprietorship of Tureaud. Property held in the name of Affiliates includes residences utilized by Tureaud and his family in the states of Michigan, Florida and New Mexico. In his December 31, 1981, Financial Statement, Tureaud listed the real estate held in the names of Affiliates as a personal asset.

From April of 1980 through June of 1982, the debtor entered into a series of promissory notes with the Penn Square Bank, with an aggregate principal balance of $22,980,515.91. Tureaud used substantial portions of the Penn Square Bank funds as well as funds raised from investors in connection with his oil and gas operations to make cash advances to the Affiliates and for their day-to-day operating expenses. Tureaud's advances to Affiliates were in excess of $3,000,000.00; Tureaud's transfers to Affiliates were approximately in the sum of $6,534,664.00 and Affiliates' transfers to Tureaud were approximately in the sum of $3,700,009.00.

When Tureaud made these cash advances to the Affiliates, Tureaud had no substantial source of income other than borrowed funds or investor funds. Transfers of funds by check, cashier's check and wire transfers were made by Tureaud to the Affiliates by George Pretszch and by Alex Ellioff. Hundreds of such transfers took place, frequently and routinely, and always pursuant to Tureaud's instruction. No promissory notes were executed in connection with these transfers.

Transfers of funds by and among the Affiliates were also done at Tureaud's instructions on an as-needed basis. None of the Affiliates ever showed a profit with the exception of River Ridge which showed a small profit early in its existence. Pursuant to Tureaud's instructions, funds were transferred by and among the Affiliates in a complex and confusing manner. Tureaud often took title to real property in the name of one Affiliate while the contracts had been entered into by another Affiliate. Additionally, Tureaud created corporate entities with similar or the same names in different states followed by the transfer of property between Affiliates without any consideration. During the period of time from February, 1980, to August, 1984, the sum of $3,330,758.80 was transferred from proceeds of loans from Heller to Tureaud's own accounts, or to Tureaud controlled accounts and charged to Linda Vista, River Ridge or Southern Lakes.

Funds and property of the Affiliates were personally utilized by Tureaud and his family for their own benefit and enjoyment, with essentially no compensation to the Affiliates for such use, and without any reasonable accounting for such use. During a period of less than 120 days during 1981, approximately $470,000 debited by Heller to Linda Vista was expended by Tureaud from these accounts for Tureaud's own personal expenses and other expenses unconnected with the business of Linda Vista, River Ridge and Southern Lakes. Tureaud and his family used a 14-bedroom mansion in Palm Beach, titled in the name of Saket Realty, as their own residence

with no accounting to Saket Realty for such use. Condominiums in Florida held in the name of River Ridge and condominiums in New Mexico held in the name of Saket Development were used as residences for Tureaud's relatives, friends, and employees without any compensation or accounting to River Ridge or Saket Development for such use. Alex Ellioff, a relative of Tureaud used a house located on Jupiter Island, Florida, held in the name of Linda Vista, without any compensation to or accounting to Linda Vista for such use.

The cross-pledges of the assets of the Affiliates, the guarantees by and among the Affiliates, the guarantee by Tureaud of practically all the debts incurred by the Affiliates, and the payment of operational expenses of Affiliates by Tureaud and other Affiliates on an as-needed basis, without regard to the source of such funds or any adequate documentation of such payments, conclusively show that Kenneth E. Tureaud and the Affiliates existed as, and were treated as, one economic unit.

The evidence clearly shows an almost total disregard of the corporate fiction; the corporations are a sham—functionally indistinguishable from each other with commingling of assets and business functions. The corporations served merely as a conduit for Tureaud. The directors and officers of the Affiliates did not act independently and in the interest of the Affiliates, but rather in the interest of the debtor and his family. Many of the Affiliates during the period of time when the affiliates were controlled by Tureaud, failed to file tax returns and other reports required by law, and three of the Affiliates, Saket Realty, Linda Vista, and Southern Lakes, were suspended by the States of Arizona, Florida and Oklahoma for failure to make required filings.

The Trustee employed accounting and business personnel to attempt to determine the financial affairs and transactions of the debtor and the Affiliates. The Trustee and his personnel examined all available books and records of the debtor and Affiliates and determined that intercompany transactions were not conducted on an arms-length basis and that accounting records of transfers of funds by and among the Affiliates are often non-existent or grossly inaccurate. Separate books were kept but no actual distinction was made between transactions of the respective companies. Consequently, there are serious accounting problems in evaluating the debtor and Affiliate accounts and determining the assets and liabilities of each Affiliate. The property of the Affiliates were hopelessly commingled and funds were used indiscriminately by all of the entities. It is impossible to accurately trace all transfers of funds and to untangle and unravel the affairs of the Affiliates and Tureaud.

It is clear, based on the inability of the Court and the creditors to reconcile and separate the financial affairs of the debtor and affiliated corporations, that consolidation will not work an injustice on the secured or unsecured creditors. The Court has carefully considered all the factors in this regard and has determined that in fact consolidation will not prejudice the secured or unsecured creditors.

Substantive consolidation will simplify and facilitate administration of the assets of the Affiliates and will maximize the prospects for realization of any potential equity in the Affiliates' assets. No substantial prejudice or injury will occur to the interest of Heller, or any other secured party, as a result of an order of substantive consolidation, inasmuch as their mortgages, security interests and liens to the extent valid, will be preserved. Consolidation will not eliminate the security interests of creditors or change the status of secured creditors to unsecured creditors. Consolidation will not eliminate guarantees by one debtor to pay for the debts of another debtor.

## CONCLUSIONS OF LAW

■ The Court must consider a number of relevant factors where consolidation of non-debtors within an individual debtor's estate is sought. After review of the testimony and documentary evidence received

in this proceeding, the Court is well satisfied that the Trustee has sustained by concrete and cogent evidence the required standard for disregarding the separate corporate entities to allow substantive consolidation of the Affiliates with the debtor's estate.

Under its general equitable powers, 11 U.S.C. § 105(a), a bankruptcy court may substantively consolidate affiliate corporations within a pending case when the assets and liabilities of different entities are dealt with as if the assets were held by, and the liabilities were incurred by a single entity.

■ The United States Supreme Court addressed the issue of consolidation in the case of *Sampsell v. Imperial Paper Corp.*, 313 U.S. 215, 216, 61 S.Ct. 904, 906, 85 L.Ed. 1293 (1941). In *Sampsell v. Imperial*, the Court held that a non-debtor corporation may be "covered into" the estate of the debtor where the affairs of the corporation are so closely assimilated to the affairs of the debtor dominant shareholder that in substance it is little more than his corporate pocket; where the corporation was formed to continue the debtor's business for the benefit of himself and his family; and where the debtor transfers property to the corporation for the purpose of placing the property beyond the reach of his creditors.

The law in this circuit was laid down in *Fish v. East*, 114 F.2d 177 (10th Cir.1940); and *F.D.I.C. v. Hogan (In the Matter of Gulfco)*, 593 F.2d 921 (10th Cir.1979). In these cases, the Tenth Circuit established the following relevant factors to be considered in a determination of whether to disregard the existence of separate corporate entities and order consolidation: Parent corporation owns all or a majority of the capital stock subsidiary; parent corporation and subsidiary have common directors and officers; parent corporation finances subsidiary; parent corporation is responsible for the incorporation of the subsidiary; subsidiary has grossly inadequate capital; parent corporation pays salaries or expenses or losses of subsidiary; subsidiary has substantially no business ex-

cept with parent corporation or no assets except those conveyed to it by parent corporation; parent refers to subsidiary as such or as a department or division; directors or executives of subsidiary do not act in the interests of subsidiary, but take directions from the parent; and the formal legal requirements of the subsidiary as a separate and independent corporation are not observed.

The Court is cognizant of the instruction given by Circuit Judge Doyle in *F.D.I.C. v. Hogan*, the holding in that case being clearly distinguishable upon its facts. In *F.D.I.C. v. Hogan*, the subsidiaries were not the instrumentality of the parent corporation, the subsidiaries were not organized fraudulently, the outward appearance of the companies was that they were not regarded as a department or division of the parent, the corporations each were independent, each had its own personnel and each paid its own salaries and expenses and had other characteristics of a separate legal entity, and the assets were not hopelessly commingled. The Court remanded for further proceedings finding that more information on a separate entity basis is essential before a determination of whether consolidation is appropriate. The Court held that consolidation could not be used to eliminate the secured status of creditors and that consolidation could not be used to eliminate guarantees made by one of the debtor corporations to pay for the debt of another. As mentioned in the above findings, these are not the facts in the case at bar.

In *Fish v. East*, the Court found that the insolvent parent organized the subsidiary as a front to raise money from public subscription in order to finance the parent and to hinder and delay creditors. The Court further found that the two corporations had been operated as a single enterprise, that the property was hopelessly commingled and funds raised by the subsidiary were used indiscriminately by both corporations, that one individual dominated and managed both corporations, and that the directors' and officers of the subsidiary did not act independently and in the interest of

the subsidiary. The Court held that the subsidiary was the mere instrumentality of the debtor and that the corporate entity should be disregarded because not to do so would defeat public convenience, justify wrong or protect fraud.

Applying these principles to the instant case, Tureaud formed affiliate corporations for his own use and benefit, and controlled all operations of the Affiliates. The relationship between Tureaud and the affiliated corporations is analogous to the relationship of parent and subsidiary present in the *Fish v. East* case, and it is clear that the majority of the factors identified in *Fish v. East* are present in the instant case.

The facts surrounding the creation, existence, and relationship of the affiliates to Tureaud are clear. There can be no doubt that the debtor and the affiliates were operated as one economic unit and that all of the operations were subject to the complete direction and control of Tureaud.

Any potential prejudice to creditors of the estate of Tureaud and the Affiliates that may result from substantive consolidation of the Affiliates within the pending case is greatly outweighed by the much greater potential for prejudice, harm and waste if substantive consolidation is not ordered. Substantive consolidation will preserve the secured status of valid mortgages, liens and security interests not otherwise avoidable by the Trustee while allowing unsecured creditors to share in all other assets without the increased costs of administering separate estates.

Upon consideration of the evidence, the Court concludes that June 7, 1983, the date the Trustee filed the application and mailed notice to interested parties, should be utilized as the effective date of consolidation for purposes of calculating the time period for the various avoiding powers available to the Trustee. For all the reasons hereinabove set forth the objections to the Application for Substantive Consolidation are denied; the separate corporate entities are disregarded; and the Affiliates are substantively consolidated within this pending case.

AND IT IS SO ORDERED.